Good afternoon. We have one argument this afternoon. We've allocated 30 minutes aside in light of the gravity and complexity of the matter. As you know, the case is before us on remand from the Supreme Court. Mr. Lev, are you prepared? I am, Your Honor. Very well. At least I hope so. I think we all share that sentiment. Good afternoon, Your Honors. I'd like to reserve three minutes of my time for rebuttal. Granted. As you said, Judge Hardiman, we're here on remand from the outset. Well, at the outset, let me say I plan to spend most of my time today on the issues surrounding the remand from the Supreme Court. I do hope to have a couple minutes at the end to briefly address some of the other issues in the case that are still before you, but I expect to spend most of my time on the remand issues. I think it's important to start with what the Supreme Court did and what they didn't do. Let's start with what they didn't do. What they didn't do is criticize the analysis that this court made of the cumulative materiality issue. Right? They didn't say anything at all about that. You found the first time that the Pennsylvania Supreme Court's finding that the impeachment evidence from the activity sheet was cumulative to the other impeachment of Mr. Jackson was an unreasonable application of Brady and its progeny. The Supreme Court didn't touch that. So there's really no reason for this court to backtrack from that rule. But what the Supreme Court did do is say that this court didn't do, didn't reach enough, that there was another alternative finding from the Pennsylvania Supreme Court. And if I may read for just a moment, the court said that this court, quote, overlooked the determination of the state courts that the notations were, as the district court put it, not exculpatory or impeaching, but instead entirely ambiguous. Then they went on to say the Court of Appeals, however, failed to address the state court ruling that the reference to Woodlock was ambiguous and any connection to the Prince's Lounge robbery speculative. Then the Supreme Court said that they were specifically not opining on that issue, but remanding it to your honors to consider. When you said at the outset the issues on remand, is that not the only issue on remand? Is that not the issue on which the Supreme Court remanded, the issue of ambiguity of the Woodlock police activity sheet? Yes, I think that is the issue on which they remanded. The ambiguity, if any, of the activity sheet and how that impacts on the gradient question. So that if we were to find that it was unreasonable for the Supreme Court to find that, that was not, well, we have that there's an open question of ambiguity. We found it was unreasonable for the state courts to have found that. They haven't touched our other ruling. That's correct. That's how I read the opinion. So wouldn't that be, this is hypothetically speaking, game, set, and match for you? I think it would be if you make that ruling. The only question I, the reason I ask the question is you started with the word issues, plural, on remand. And I just was curious as to whether it was just the issue on remand. And I think I say issues, Judge Barry, because I think that the Supreme, the state court's ruling to the extent they made one on ambiguity is unreasonable for a couple of different reasons. So I think my argument today will all go to that issue. But I think I have a couple of different reasons why I think that was, to the extent that ruling was made, it was an unreasonable ruling. So let me go there. Let's start with the idea. I think what we have to do is we have to look at that ruling. And of course in my brief, you know, we argue that we don't see, from Mr. Lambert's perspective, that the state court actually made a ruling that it was ambiguous. It's a moot point in light of what the high court said. It's a moot point. It's a moot point, be that as it may. So we have to look at that ruling under both, I think, 2254 D1 and 2254 D2. And in my position, it's both an unreasonable determination of fact, and it's an unreasonable application of Brady and Bagley and Giglio and Kiles and the whole body of Supreme Court law that we're applying in this case. So let me first deal with why I think it's an unreasonable determination of fact under D2. The first, the activity we have is clearly part of the homicide investigation. The notation that Jackson named Woodlock as his co-defendant is written on a piece of paper that is solely a part of the homicide investigation. Everything about it is this case. The witnesses to whom the photos were shown, the case number, et cetera, is all relative to this case. That's correct. However, there is this strange nomenclature, this co-defendant. There's not even a case to even have a co-defendant. So that creates some degree of confusion right there, does it not? Well, there is a case because Jackson has already been arrested. Jackson made his admissions about his participation in this robbery first on October 14th and then in another statement on October 22nd. Not just this robbery, but a whole slew of robberies, as many as 12? Right. The statement on October 14th deals with this robbery. The statement on October 22nd deals with this robbery and 12 other robberies, or 13 other robberies, something like that. In the statement of the 22nd, where he talks about all of the other robberies, he never mentions Woodlock in that statement. He talks about some of the people who he committed these crimes with, mostly with Reese. I think eight of them were with just him and Reese. But he mentions, by nickname, Ant-Man and Underdog and a couple of others. But he never says Woodlock. He never relates in that statement about the robberies. And that's the only statement about the robberies that he had. He never relates Woodlock to those robberies. So the only place Woodlock's related to is on the homicide. Woodlock's never charged with any other robbery. Right? Woodlock's not charged at all. They investigate Woodlock for the homicide. He's not identified by the witnesses. They look for him. They don't find him. And then there's no other indication that they pursued that line. And that's unsurprising, is it not? Because there's absolutely nothing anywhere that could connect Woodlock with this crime except the police activity. Except for Jackson. Right? Just like Lambert. The only thing connecting Woodlock to this crime is Jackson saying that. But Mary Ryan identified. But she doesn't identify him until the trial defendant's case. Right. It's rather late in the trial. At the time of trial. And of course the circumstances of her identification raise incredible issues about the reliability and the accuracy and the credibility. That's all true, I think. But those are jury issues, aren't they? Well, we argue that it's a suppression issue. That it could be a suppression issue and that it should have been a suppression issue. And that it should have been suppressed. But ultimately it does become a jury issue. But what the jury has is they have Ryan and Jackson corroborating each other. So as weak as either one is individually... You have a victim and a perpetrator both pointing the finger at your client. If you take out one of those legs, then the other one falls down too. Right? And you don't have that essential corroboration that made the Commonwealth's case. So if we take out Jackson, and that's what this activity sheet does. It takes out the cornerstone of Jackson's reliability. Because you'll recall that in closing argument, in both his presentation, his questioning of Jackson, and in closing argument, the prosecutor. And Kyles tells us that it's appropriate to look at what the prosecutor says when we judge materiality within the context of the case. The prosecutor says, well, Jackson said a whole lot of things that were inconsistent and untrue to the police. And he told a lot of statements. But the one thing he was always consistent about, the one thing he could always believe, was that he identified Reese and Lambert as the people who did this. That's precisely why you persuaded the three of us before that it was material. You got around the often... the frequent refuge of the government in terms of cumulative impeachment by articulating then what you just did now. But how does that shed any light on the state court's finding that the police activity sheet was ambiguous? I think it does for this reason. And this takes me... So let me go back. So I think that the unreasonableness of the finding of ambiguity comes from kind of two lines of thought. One is the sheet itself, which as we all agree is all about the homicide. And that's where it's written down. And the other is the absence of any evidence connecting Woodblock to any of those other robberies. It's not in the statement Jackson made about the robberies. There's no indication that any witnesses from any of those robberies were ever shown photos of Woodblock. There's no evidence. Unlike the homicide detectives who acted upon that statement. And remember, the homicide detectives must have thought there was a connection between Woodblock and this robbery, or a possible connection, that this statement by Jackson was related to the homicide. Because they took action. They went out and put together a photo array and showed it and looked for Woodblock. There's no indication that was done in any of the other robberies. And Woodblock wasn't charged in any of the other robberies. So we have, on the one hand, the affirmative evidence of connection. And on the other hand, we have the negative evidence of no connection, no other evidence connecting him to any of the robberies. So... But why does all that lead to the more logical or more probable conclusion that Woodblock was a straw man that Jackson threw out there? Exactly. I think that's exactly the point, Judge Hardiman. That the theory of the defense was that Jackson is making up the participation of a third person. That this robbery was done by Jackson and Reese. Because remember, the only identifications that the police obtained in this case were that Jackson was inside and was part of the robbery. Jackson denied that. The only person who puts a third person in this robbery is Jackson. No other evidence of a third person, other than what Jackson says. Wait a minute. Reese's own attorney elicited testimony from Mary Ryan that Lambert was there. He did. So if you're telling us that Jackson was involved in the robbery, we've now got Reese, Jackson, and Lambert. Three people. Well, we now have Jackson saying, we have Jackson involved. And that's a conflict. And that raises, even then, that raises reasonable doubt. Right? The defense would say, you know, there'd be another reason why the defense could argue that Janet Ryan's identification is not to be relied upon. It is not reasonable. Because the sheet shows, right, the activity sheet, the statement that Woodlock shows, shows that Jackson was throwing out straw men. And finally, one of those straw men hit. And then Janet Ryan, who comes into the trial 18 months later, after having told the police that she didn't see the face of the person, and makes this surprise courtroom identification when called by Reese. So there's a lot of room for doubt. And Jackson's statement about Woodlock explains, undercuts that consistency. And that's why it's material. And the two factors I was talking about show why it's not ambiguous. But let me also give you an alternative idea of how the state court finding is unreasonable. Because even if you were to find that there was some ambiguity in the statement, that would not be the be all and end all of the question. Because the question then would become, the state court found, according to the Supreme Court, that because it was ambiguous, it was neither exculpatory nor impeaching under Brady. And that's an erroneous standard, right? Because Brady allows for, Brady expects that evidence can have some ambiguity and still be favorable or exculpatory and have to be disclosed if it's material. Brady itself says that exculpatory evidence or favorable evidence is evidence that tends to exculpate. Giglio says it's evidence that is possibly useful to the defense. Bagley says it's evidence that might be helpful to the defense. I might get Giglio and Bagley confused. Kiles, which I think is a particularly important case, says it's evidence that has favorable tendencies. So even if there's some ambiguity in it, the conclusion, the legal conclusion that because it's ambiguity, it's not disclosable under Brady, is contrary to those Supreme Court cases. And I think Kiles is a good example. Are you suggesting that the court's opinion violated all of those prior precedents of the court? Yes. Yes. Because to the extent they found that ambiguous evidence, that evidence with some ambiguity can't be favorable or exculpatory under Brady, doesn't beat that first prong of the Brady test. I'm not sure you're giving the state court decision enough credit there because I thought the analysis, based on what I read in the Supreme Court's opinion, is that the high court found that the state court made a determination of ambiguity, whether people are convinced of that or not, is immaterial because that's what they said. And then what that means is we have to look to the state court's decision under the AEDPA deferential standard of review in order to determine whether the state court was wrong to say that that ambiguity did not satisfy the AEDPA standard. Do you understand the distinction between what I'm positing and what you were just arguing? I think so, but let me ask back and see if I do. Because in my mind, just the question of ambiguity alone doesn't answer the Brady question. So it's not just, as I read, and this is... Right, right. Your syllogism, as I understand it, Mr. Lev, is ambiguity does not equal non-Brady. That's right. And I think that's, Mr. Eisenberg might even agree with that, but I think the tougher question is, for the state court to have concluded it was ambiguous, therefore that court didn't find a Brady violation. You need to argue to us under AEDPA why that determination doesn't satisfy the AEDPA standard. And I think what I'm trying to do is that if it's ambiguous, we still have to look at whether it's favorable evidence, whether they're exculpatory, whether there's favorable tendencies that can be drawn from that evidence. Right, and what did the state court say about that? The state court didn't say. But even the ambiguous, that it might have referred, that's the ambiguity we're talking about, that this statement might have referred to the other robberies. It means that it might not have. That becomes a question for the jury to draw. And let me try to answer this question maybe this way, Judge Hardiman. If we think about this in terms of, what could reasonably competent defense counsel do with this piece of evidence, if they had it at the time of trial? Because I think this is the kind of evidence that defense lawyers love, because you can use it in a way that whatever answer you get is helpful to the defense. And let me try to explain what I mean by that. You ask Jackson's on the stand, and with this evidence at hand, you ask Jackson, did you tell the police that Leonard Woodlock was your co-defendant? Jackson can say, no, I didn't. And if he says, no, I didn't say that to the police, then you can call the police officers who took that statement and wrote it down, and impeach Jackson, and you have Jackson lying to the jury right in front of them. And you can use that lie to further attack his credibility, and use the substance of that statement to make the argument you made before that he's throwing out straws. So if he answers, no, it's helpful. If he answers, yes, I told them that, then that's helpful, because that undercuts the consistency theory that the prosecution relied on to show that his identification of Reese and Lambert are consistent. Let me see if I understand. I'm going to go back to the point you were talking about, ambiguous, and what it means. Let me see if I understand what you're saying. You're saying one definition of ambiguous is evidence that is subject to conflicting inferences. And you say that can't be what this – that ambiguous can't mean that here, because the jury has to be able to – if it is an issue that the – an inference that a reasonable jury could answer in favor of the defendant's view, then it can't be excluded on ambiguity grounds. Is that – I think what I'm saying, Judge Stapleton, is that to me, ambiguous is right, that you can draw differing inferences from it. And so that if the jury can draw favorable inferences and use that to the defendant's favor, if reasonable defense counsel, reasonably competent counsel, can use the evidence in the defendant's favor, then even though it's ambiguous, it's still Brady material. What ambiguity is not is if this statement had said, Woodlock was my co-defendant in another robbery, then you would have a non-ambiguous statement, right? And then that might not be Brady, and that might not be helpful to the defense, although it might open up certain lines of questioning. But that's not what we have. What we have is a statement, which I think is not ambiguous, because it does relate to the homicide, but at best allows inferences to be drawn either way. And so as long as you have those favorable inferences, then you have to put it into the Brady analysis. And if I can go back to where I was. If you ask Woodlock, if you ask Jackson, did you say this to the police? And he says, yes, I said this to the police, but I meant that Woodlock was my co-defendant in another robbery. Then that opens up a whole line of questioning in which you can ask Jackson, you can develop, when did you say that? Who did you say that to? Did they write it down? Where did they write it down? Because no paperwork has ever been produced. To my knowledge, no paperwork exists of that. You could call the police officers to ask what they did to follow up, and to my knowledge, there's no follow-up to that. And so you could even use that answer, both to attack the credibility of what Jackson's saying, and to show, to attack the integrity and the quality of the police investigation and follow-up. And Kyles tells us that one of the aspects of Brady material, disclosable material that we're supposed to look at, is can defense use that to not only forward the defense theory, but to attack the quality of the investigation? So whatever answer Jackson, plus once Jackson starts talking about who he did the other robberies with, that maybe opens the door to letting Lambert bring out that reason Jackson did this whole series of bar robberies together, and make the argument that he was precluded from making by the trial court's ruling where they wouldn't let that in, that might have opened the door to reverse that ruling and to let that in. So that's why this is such a critical piece of information for the defense, and how reasonable counsel could have used it, because it's the kind of question, a kind of document that trial lawyers can use whatever answer, whatever explanation Jackson gives to them, helps the defense, and forwards the defense. And in a case that's as weak as this case is on its face, and that's the other part of the materiality analysis, that the state court never acknowledged. And another reason why the state court's application of whatever ambiguity they might have found, I think is unreasonable in its application of Brady, is because they never acknowledged that this was a weak case. The state court never acknowledged the trial prosecutor's argument about consistency. The state court never acknowledged how this evidence might have fit in with the defense theory that Jackson was throwing up straw men. And so for all those reasons, this becomes an important piece of evidence, even if it's ambiguous. And it's a Brady violation even if it's ambiguous. But going back to where we started, I don't see any ambiguity here. All of the affirmative evidence here shows that it's about the homicide. So you're saying that any ambiguous evidence is a Brady violation? No, no. Of course, you've got to look at the nature of the ambiguity, how strong the ambiguity is. You have to look at that evidence in light of all the other evidence and the strength of the prosecution's case. It becomes one piece. I think in this case, though, where the commonwealth's case was so weak and where the commonwealth's emphasis on consistency was so strong, that it becomes a Brady violation here. If you had a case where you had four other identifications of Lambert, where you had fingerprints, if you had DNA, then this wouldn't matter. Then this wouldn't be material. But in this case, with these facts, it's incredibly material. Let me speak briefly about a couple of the other issues. I don't plan to go into particular detail today. They're all briefed and we argued about the other issues at length the last time we were here. And so all those issues are before you. I want to call to your attention particularly Claim 2 in the brief that deals with this question about whether or not it was the refusal to allow Lambert to introduce evidence that Jackson and Reese did these eight other bar robberies together as part of a common plan scheme and design. And that in my view, in our view, that ruling by the trial judge violated two lines of constitutional protection. One is the right to present evidence in your defense because that evidence is affirmative evidence that Jackson and Reese can be used, that inferences can be drawn that Jackson and Reese did this crime together and that's consistent with the identifications of Jackson. As the person at the door, it's consistent with the evidence that Reese was the shooter that you point out in your opinion the last time that there was significant evidence in the record that Reese had the .38, that was the murder weapon, that Reese's 5'7", which is the height described as the shooter. More particularly, even if you worry about people who don't accurately describe heights, what they do accurately describe is comparisons. And we know that the witnesses to the shooting all said the shooter was several inches shorter than the victims. The victims were 5'11 and 6', Lambert is 6', Reese is 5'7". So there's substantial evidence that Reese is the shooter, there's substantial evidence that Jackson is in the bar and that this evidence, the evidence that Reese and Jackson had this criminal partnership together is important evidence that the defense should have been allowed to present and it's unreasonable to find that they're not. But it's also a confrontation clause issue because showing the relationship between Reese and Jackson and Jackson's motivation to mitigate Reese's responsibility, Jackson's motivation because of his social relationship with Jackson and because of his criminal partnership with Jackson to make Reese the non-shooter is motive for Jackson to testify in a way that favors Reese and opposite Lambert. And so this criminal relationship, this criminal partnership that Reese and Jackson have together is relevant impeachment evidence, is relevant confrontation evidence. And so at least as to the right of confrontation, Lambert's lawyers should have been able to ask about that and to cross-examine to show Jackson's motivation to favor Reese. And so that issue is brief and I hope the court will pay, I know you will take careful consideration to that. The last issue I want to touch upon briefly is the Mills issue. If you recall and I'm sure you do, this court originally issued an order granting Mills relief while you were considering all the other guilt-based issues. And you vacated that order when you issued your opinion granted in the trial as moot. The Mills issue is back before you and there's no reason to change your ruling on the Mills issue. There has been a significant development in the Abu Jamal case that was remanded by the Supreme Court back to the circuit to consider the impact of Stesak vs. Smith on the Mills analysis. The Abu Jamal panel of course found that Stesak did not impact on the Mills analysis, that this court's Mills analysis that it applied in Abu Jamal and Albrecht and the other cases, which is equally applicable here is still good law. The Mills issue is not still before us if we were to find there was no ambiguity and there's no reason to revisit what we did before on the impeachment, correct? It would still be moot in that case because if you're granting a new trial, you don't need to address the sentencing issues. I just wanted to remind you that to whatever extent we thought Stesak might have impacted on the Mills analysis, Abu Jamal answered that question, cert was denied in Abu Jamal. If you get to your Mills analysis, it's still good law. We'll hear you on rebuttal. Thank you. May it please the court. I'll address that ambiguity issue as it's been termed. It's the threshold question because it underlies the entire Brady analysis and because the Supreme Court held that the question of Woodlock's statement was essential to the Brady claim, whether it referred to this case or to other cases. Humor me a little here. I understand in your brief you accept what the Supreme Court said, as you should, that there's a question of ambiguity, an open question that we did not decide. We obviously are accepting that. But you say throughout your brief and you just used the word now, the state Supreme Court held that the activity sheet was ambiguous, that that was the holding. Can you tell me, and you don't in your brief, precisely where the Supreme Court of Pennsylvania held that? Yes, Your Honor. It's in the A Second Reporter, Volume 884 at page 855. Would you read it to me, please? You said 855? I said 855. Actually, I'll read it to you as addressed by the U.S. Supreme Court. No, no, no. I'm asking you, the Supreme Court of Pennsylvania, not the Supreme Court of the United States, where does the Supreme Court of Pennsylvania hold that it was ambiguous? It held that on the page that I cited where it said that the Commonwealth accurately notes that the police must not have had reason to consider Woodlock as a potential defendant in this case, as his name is not mentioned anywhere else in the police investigation files. And furthermore, Appellant's argument that this document reveals that Jackson named Woodlock as a co-defendant prior to identifying Appellant is inaccurate. In his second formal statement to police on October 22nd, three days prior to the documented issue, Jackson identified the third participant in the robbery as Monk, Appellant's nickname. Is that holding as ambiguous? I think actually it's more than ambiguous. I think that they're saying that the assertion by the defense, which was the premise of the defense position in state court, that the Lawrence Woodlock reference relates to this case is inaccurate. They're almost making a factual finding that Woodlock is not part of this double homicide. Whether it's a factual finding or a legal finding, your Honor, it's entitled to deference in this court. And that was the point of the United States Supreme Court. Now, Judge Barry, you used the words should accept in relation to the U.S. Supreme Court's opinion. Of course, those are not really the right words. So there is no room for this court to reject the holding of the United States Supreme Court if there was a state court's determination on that point. Of course, under the deference standard, it wouldn't really matter anyway. What is subject to deference is the result in the state court, not the reasoning of the state court, so that even if the state court hadn't made the comment that I just read, it would still be incumbent on the federal court to consider the threshold question of whether the Woodlock reference even relates to this case at all. Now, on that point... Did the state court make a finding of fact in that regard? It gave the language that I just read. And as I say, Your Honor... That's all we have to go on. Well, it was all that the U.S. Supreme Court had to go on, and the U.S. Supreme Court held that that was enough. But as I say, Your Honor, had the state court not said that, it would still be an issue whether the Woodlock statement relates to this case or other cases. And that is the threshold issue for assessing the materiality of the Woodlock reference. I'm sorry. How can that be the threshold issue? Your friend across the way said that... We're talking about due process here in fairness to a defendant, and ambiguity is normally thought of as evidence from which differing inferences could be drawn. And that... Well, I think the issue is not whether it's ambiguous, but whether a reasonable juror could draw the inference that the defense wishes it to draw. Yes, Your Honor, and the threshold question of whether the jury could reasonably do that, or was likely to do that, if there's a reasonable probability that the jury would do that, is whether the Woodlock reference even relates to this case. Because if it doesn't, then it is obvious that the jury could not reasonably take that statement as evidence in the defendant's favor. If it's not about this case, in fact, Your Honor, it would not even have been admissible. Now, I understand there's all sorts of inadmissible evidence that a defense attorney can make use of as a defense. That's not the grading test. Wait a minute. Why couldn't the juror, a reasonable juror, given all the evidence of how the investigating officers understood this comment, that is, evidence that they took it as referring to this case, how could it be unreasonable for a juror to make the same inference? Your Honor, there isn't all the evidence about how the investigating officers took this reference. Mr. Lev has made some statements that are completely unsupported. He has said that this evidence relates to this case because Lawrence Woodlock was never charged with any other robberies other than the reference that we have here. That's not in the record. There's no evidence of that. There's one of several of his reasons. Well, I will address them all, Your Honor. Absolutely. He read from the police activity report with the names of the witnesses to the homicide, with the names of the homicide detectives, so there are a few other facts which I think you have to mention. There are a few other facts, Your Honor, but certainly one of them is not that Lawrence Woodlock was never charged with or investigated for any other robberies. If he had been, and if any paperwork had been generated in those cases, it wouldn't have been part of the paperwork in this case. The fact that paperwork for those other robberies doesn't appear in this case is absolutely meaningless. This is an activity report about the murder. This is, Your Honor. Why would they put in this statement of Jackson what they did in other cases, subsequent investigations into the other robberies? I have no place in this activity. Your Honor, I'm not suggesting that this activity sheet reports subsequent activities that they did for the other places. I'm suggesting that the name arose in relation to the other robberies, that there's a great deal of evidence in favor of that. Woodlock's name in the other robberies? Where? Is there any evidence of that? Where? You just used that you said that. I didn't make that up. The evidence comes from the nature of the statements themselves, all the statements given by Jackson. The defense theory, as we've heard it articulated today and in the past, is that when he said the name Woodlock, he must have meant that he was saying that that was the third person in this robbery, and we know that's true because the police went off and showed his picture to people. But the truth is that the context of all the statements, four of them, which start both before and after the date of this activity sheet, show that that's not the case. In his first statement, right at the time that he was arrested, on October 14th of 1982, he didn't just refuse to identify the third person. On the contrary, he described that person as the dude that they met at Janie Stevens' house in Darby. He locked himself into that position, that identification of the third person, on the very first day. We did the robbery with the guy we met at Janie Stevens' house in Darby, and afterwards we all went back to the house in Darby. It's a joint supplemental appendix on page 181. His next statement was on October 22nd. Again, this is before the activity sheet, which is dated October 25th. In that statement on October 22nd, he added one small detail. The nickname of that man was Monk. But again, he said, that's the guy that we met at Janie's house. He added another detail also, that Janie lived with Monk at her house in Darby. And who did Dude and Monk turn out to be? Not Woodcock. No, exactly, Your Honor. It turned out to be James Lambert. And in his next statement, which was on January 14th, he told the police the real name of Monk, which was James Lambert. That's at the joint supplemental appendix on page 197. And he identified a photo of Monk, which was James Lambert's photo, and on the back of that photo was James Lambert's address. It's the address of Janie Stevens in Upper Darby. And he said again, that after the robbery, we went back to the house in Upper Darby. And in his last statement, on February 6th, this is at the JSA at page 211, he again said, we met Monk at Janie Stevens' house in Upper Darby, and after the robbery, we all went back. Monk was staying with Janie Stevens. That's what he said in all of those statements. That was his only consistency, wasn't it? It was not his only consistency, but it was an extremely important consistency. And the fact that that is what he said in all the statements, both before and after the date of this activity sheet on October 25th, raises a huge question about the meaning of the October 25th activity sheet. If the police really thought that Woodlock was being named, why didn't they do anything? Why is there nothing that reveals what they did? Why didn't they do anything more? And why didn't they do anything more? Your Honor, it's not as if the police were trying to pin this all on Lambert. In fact, when you read through the four statements, what you see is that the police were pushing Jackson on his identification of Lambert as the shooter. They were skeptical of what he was telling them, because they knew that he was Reese's brother-in-law, and they knew that he had a motive to cover for Reese. So when Jackson told them from the beginning that Lambert was the shooter, the police were skeptical. They pushed him, they polygraphed him, and they got him to admit in the end, as the statements show, that Lambert never actually admitted to him, as he had first claimed, that Lambert was the shooter. Jackson said all along, I wasn't there, I wasn't inside, I didn't see it myself. But he was identified as being inside. He was, Your Honor, and that point was debated for the jury. And the prosecutor's argument apparently prevailed with the jury, because the prosecutor said, and the prosecutor's argument was perfectly reasonable, which was that he was in and out of the bar, including moments before this robbery, and that is likely what led to the identification, particularly because he was ID'd as the second man, the non-shooter, the man who was standing on the stairway at the entrance into the bar. And that man, all the evidence agreed, was wearing a hat and sunglasses. So the identification of the man standing on the stairway had to be an identification of somebody that nobody knew personally, and who was wearing a hat and sunglasses. If I said it strikes me that the argument that you're making is an argument that would appropriately be addressed to the jury, what would you say? Well, Your Honor, if the defense had made this, had been allowed to present this sort of evidence at trial, of course these arguments would have been made to the jury. But the fact that they can be made to the jury, that there's a jury argument made assuming the admission of the evidence, is not what makes the evidence material. That's not enough to meet the materiality standard. And if before the trial, the defendant had said, I want to introduce this evidence about Lawrence Woodlock, and the prosecution had said, that evidence doesn't have to do with this case, it has to do with the other robberies, the judge would have had to make a determination. Do you see a distinction between introducing evidence as a document, and using something as impeachment material? Either way, Your Honor. The evidence, the judge would have had to make a determination about whether the evidence was relevant. And if it applied, if the comment referred to other crimes, not this one, it would not even have been relevant. That's not what happened here. No, the activity sheet was this crime. This reference was made in the activity sheet of this crime. So this is coming into evidence. It's not an admissibility or relevance issue, it's a materiality issue. I think there would still have to be some determination of what this evidence had to do with. And we would hear from the kind of people that would be relevant. So the proffer is, Your Honor, it has to do with this crime, because guess what, the photo where it was shown to two of the women in the bar, and it has the case number on it, okay, it's coming in. And the prosecutor would have debated whether it would come in, and maybe he would have lost. This is coming in. The question is, is it material? Yes, Your Honor, exactly, that's the question. And the state court, I just read it again for the umpteenth time, and the state court says it's not material, but there is a whole laundry list of reasons there, one of which is the reason that we found erroneous when you were before us previously, which was that the court didn't distinguish between the thorough impeachment of Jackson and the qualitative difference between that thorough impeachment and the fact that he was never impeached on the issue of always being consistent about never identifying anyone else. Well, I think actually what Your Honor is getting at is that I think that this prior opinion treated the Pennsylvania Supreme Court's opinion as if they were saying that it was automatically non-material because of the existence of the Supreme Court. Your argument was, you argued, this is what you said, argued that it was automatically, that the defense is automatically impeaching. I don't believe that that's true, Your Honor. My question, though, is, I mean, obviously, our decision saying that the state court wrongly analyzed the thoroughgoing impeachment, shall we call it, has now been reversed. But my question to you is, how do we excise that out from what the state court said? You know, we have to go along with the court's, well, I'm sorry, the court made no opinion on that, right? But the court said we need to go back and look at the state court's opinion regarding ambiguity. So the question then becomes, can't we still say that the state court did not violate the deferential AEDPA standard vis-a-vis ambiguity, but it was still wrong under the AEDPA standard with respect to materiality? There could be such a case, Your Honor. The problem here is that the reason that the state court would not be unreasonable in finding at least ambiguity would indeed, on the facts of this case, preclude a finding of materiality. Okay, that's very important. So let's make sure we run that through in all its iterations. Why is that the case? Because I'm not sure I understand why that's necessarily so. I think this gets back to what you were discussing with Mr. Lev, Judge Hardiman. Mr. Lev was making a generalized argument that ambiguity in and of itself does not defeat materiality. And your response to him was that, sure, even Mr. Eisenberg might agree with that general statement, but what about on the facts of this case? And that's really all I'm trying to say here, Your Honor. If there's a significant question about whether the Woodlock reference even refers to this crime as opposed to the other robberies, if there's a significant question, that is, about whether Bernard Jackson named Woodlock as another perpetrator in this crime that significantly undermines any claim of materiality of this information to the point where there is no way to find that the state court's ultimate holding was unreasonable. That's the crux of the point, Your Honor. And all the information about all the other statements tells us, so significantly reduces the likelihood of any claim that Bernard Jackson meant, if he even said the words himself, when he referred to Lawrence Woodlock, that he meant to put him in this crime as opposed to the other one. All right. So to put all that in layman's terms, and what I understand you to be saying, Mr. Eisenberg, is the state court got it right because one would absolutely expect Woodlock's name to be appearing periodically throughout this case, and it appears nowhere except this one isolated document. It's not just that Woodlock's name is absent. It's that Monk's name, the dude from Upper Darby at Janie's house, is consistent throughout all four statements. And to go further, Your Honor, it's not just Jackson's four statements that relate to the materiality question. It's also Lambert's statement. When he was arrested, eight months after Bernard Jackson first identified that dude from Upper Darby at Janie's house, when he was arrested, lo and behold, what did he say? Yes, my nickname is Monk. Yes, I was living with Janie Stevens in Upper Darby at that house. And not only that, he also said, yes, I was with Jackson and Reese that night. Before they went. Not just before, Your Honor, but also after. But not at. Don't make that distinction. Absolutely, Your Honor. He didn't say he denied doing the robbery. What he said specifically was, we all met at Janie's house. We talked about doing robberies. We drove to West Philadelphia. I told them I wasn't going to do this robbery. Drop me off. They dropped me off, and about 20 minutes later, they picked me up. That was his statement. That absolutely relates to the materiality analysis. Because what the jury would have to believe under the defense theory of Lawrence Woodlock is that this is what happened. Everybody met at Janie's house that night, just like Jackson said. Everybody decided to do a robbery and drove into West Philadelphia, just like Jackson said. But then, unlike what Jackson said, they dropped off Woodlock, not Woodlock, Lambert in West Philadelphia. They picked up Woodlock. They went and they did the robbery. They killed two people who they didn't intend to kill. They ran out of the bar. They dropped off Woodlock. Then they remembered, oh, let's go pick up our friend Lambert. Then they all drove back to Janie's house in Upper Darby. Because everybody, Jackson and Lambert, agrees on what happened outside the parameters of the crime. And there is no way that that cannot be considered in assessing the materiality of the evidence. Even if we agree with what you just said, how do we deal with the fact, let me ask it this way, do you concede that the trial would have been very different with this document? Because having read the trial transcript more than a few times, there's no doubt in my mind that the prosecutor's chief argument was something like this. Jackson's not a model witness. We've all heard this speech many times in criminal trials. You don't hire Girl Scouts to testify to these things, etc., etc. But listen to this. He's always been consistent on one thing, and it's this person, fingering Lambert. And would this trial not have been very different with this case activity? I'm sorry, Your Honor. The reality is that there was a great deal more to the prosecutor's argument than the consistency about naming Reese and Jackson was only one small part of it. In defending Jackson's credibility, he went much further, and he pointed out a number of things. He said, for example, that on October 14th, the day he was arrested, when Jackson said there was a 38 here that was involved in the murder, he couldn't have known then that the police had already covered bullets of exactly that caliber from the victim's dead bodies. When, on October 14th, he decided to confess and started giving the police that information, he couldn't have known that six months later, in March of the next year, Reese would be arrested and in possession of a 32-caliber gun, even though he told, Jackson told the police in October that there were two guns involved in this, a 32 and a 38, and the 38 was the murder weapon. When Jackson gave his statement in October, starting in October, he could not possibly have known that eight months later, James Lambert would be arrested and he would admit to police that he really did live with Janie Stevens, as Jackson told them in October, that his nickname really was Monk, as Jackson told them in October, that he really was with Reese and Jackson that very night, just before and just after the crime, as Jackson told them in October, and he surely couldn't have known, when he gave that statement in October, that at the trial, Janet Ryan would take the stand and say, yes, now I recognize the shooter, it was James Lambert. He couldn't have known any of those things. That sounds like an argument we see a lot in Brady cases to the effect that the evidence is so overwhelming here that this Brady violation is immaterial. But I don't see the state court saying that here in this case. Get it? Two things, Your Honor. First of all, I don't think that the evidence has to be characterized as overwhelming in order to find that the new evidence is not material. Second of all, it doesn't matter under the deference standard exactly what language the state court used. Under Harrington v. Richter, the state court does not say anything. That's exactly right. And furthermore, under Harrington v. Richter, Your Honor, you cannot reverse unless no fair-minded jurist could possibly disagree with the state court ruling. That's the exact language from Harrington. And what that language applies to is not any facet of the state court's opinion. Most of the petitioner's brief, Your Honor, talks about the state court did this, didn't do this, the opinion didn't address our argument about this. None of that is relevant under the deference analysis, Your Honor. It's an objective standard. It's a reasonableness standard. And the question applies to the result, not to the reasoning. We really don't even have any help from the district court because the district court lumped all of the reports and activity sheets together when it found about the fully exculpatory and the Supreme Court adopted that. The district court wrote over 100 pages. But it did not specify the October 25th police activity report in terms of ambiguity. It identified separately each of the activity reports and then it gave its ultimate conclusion that all of them, not just the October 25th, were ambiguous. It never said the state court found that. All necessary includes the one, Your Honor. So all of those things relate to the materiality, Your Honor. All of Jackson's statements, Lambert's own statements, and here's the main thing, Your Honor. This is a collateral review case. The question here is whether the defendant met his burden in the state court of showing that there was a Brady error and whether the state court's ruling that he didn't was unreasonable. In the state court, he had the opportunity to address exactly these questions. Now Mr. Lev says, well, we could have called the other police officers to testify that he really did say this to us. Well, that's exactly what should have been proffered on a post-conviction review in state court. We have no idea whether the other police officers would say that Bernard Jackson really made this statement or what he meant by it. We would have had an idea if there had been evidence presented in state court and on collateral review, it was the defendant's burden. But here's the even more important piece of evidence. Did they have an evidentiary here? No, Your Honor, there was no evidentiary here. Because they never made a proffer for any such evidence, Your Honor. And the key piece of evidence, the piece of evidence that would have entirely addressed this question was, of course, Bernard Jackson himself. He was available. In fact, Bernard Jackson purportedly signed an affidavit shortly after the trial in which he said, I made a mistake. I was wrong when I testified that it was Lambert who was the one who confronted the woman at the bar and who was therefore the shooter. It was really Reese. He filed an affidavit saying that and the state court rejected that and that ruling was upheld on the direct appeal by the Pennsylvania Supreme Court. But there's Jackson. Bring him in. You didn't ask him about Woodlock then. You didn't know about Woodlock, but now you know about Woodlock. Why did you never ask Bernard Jackson what he meant, what he would say he meant about that? There has never been any proffer from the defense about Bernard Jackson to resolve this mystery of what was being referred to on the sheet. And it was not the Commonwealth's obligation to do so at that point. With all the indications here raising at least a significant question about what these activity sheets meant. It was the defendant's burden to show more and they didn't. If you look at the top of the activity sheets, there are several in the record. They all have the same heading. They all say the same thing. They all say Sgt. Strom, Lt. Hanson, assigned Kelhower. But if you look through the other paper, you see that many of the documents were not prepared by any of those three names. Some of the statements of Jackson, for example, were taken by Detective McCormick or Detective Gerace or another detective. So the names don't always match up. And we can't infer merely from that one sheet of paper with three or four lines of writing the ultimate question that is presumed by the defense that Jackson was referring to this case. Now I'd like to briefly address the other issues raised by Mr. Lev. First, the issue of the admissibility of the Jackson-Reese prior robberies. The reality is that the state Supreme Court in its first opinion on direct appeal rejected that argument and it said this isn't a common plan. It doesn't meet our standards for common plan. That would have been true even in a separate trial, even if they were tried separately and Lambert had tried to bring in evidence. What the statements show us is that Jackson committed his robberies in a variety of different fashions. He committed some with Reese. He committed some with Reese and a third guy. He committed some without Reese and some other person. There was no common plan there. That's all the state court held and the petitioner doesn't even address that ruling or explain why that ruling was an unreasonable determination on a constitutional question. As for Mills, there is one huge distinction between this case and the other precedents from the circuit not addressed by the defense and that is the fact that in this case the defendant waived his right to present mitigating evidence at the trial and there is absolutely no clear precedent for the United States Supreme Court that says that you are entitled to the benefit of the Mills rule where you on the record give up your right to present any mitigating evidence at all. Let me ask you one question about Caldwell. In Caldwell the judge told the jury that after they reached a decision there would be an automatic appeal to the Supreme Court, automatic transfer to the Supreme Court of the state and that in addition to correcting the errors at trial, the Supreme Court will either affirm the sentence of death or vacate it and remand for the imposition of a life sentence. Now given the contrast there between the authority of correcting errors at trial and deciding whether there's going to be ultimately a death sentence or a life sentence, doesn't that tell the jury that they're not the ones that are going to make the final decision about whether this man dies? No, Your Honor. If that's true, of course that's a Caldwell violation. Why is it not true? Because the comments here were well short of the comments in Caldwell, Your Honor. The judge did not go out of his way to try to diminish the jury's sense of responsibility. He merely stated that there would be an appeal to the Supreme Court and the prosecutor contrary to what happened in Caldwell did exactly the opposite of diminishing the jury's sense of responsibility. He went out of his way to tell them, I know this is not an easy duty, I know this is a very difficult job. He emphasized to them the importance of their task and the importance of their decision. And I know that there was a Circuit President Riley that also addressed this issue. Riley was not a deference case. It was pre-EDPA. There is no way that the state court's ruling that the very mild comments here were not a Caldwell violation can be found unreasonable. Thank you. Thank you, Mr. Eisenberg. Mr. Lev, rebuttal. I'd just like to address a couple of points. Mr. Eisenberg's argument was based largely on the assumption that the defense theory was that Woodlock was the third person. That wasn't the defense theory. That was part of it. But mostly the defense theory, both at trial and in post-conviction, was that Jackson was throwing out straw men and Woodlock was a straw man. And that after the police went to the bar and couldn't get an ID of Woodlock, they decided that Woodlock was not a straw man who was going to stick. And so Jackson went back to Monk, who he had met that night. There's no dispute about that. Other than Woodlock, of whom you were unaware at the time of trial, who were the alleged straw men? Well, it was Monk and it was Woodlock. But we know Monk is Lambert, though. Monk is Lambert, yes. So there are no other straw men then. So the defense theory was... Putting my defense lawyer hat on, gee, I wish I could have argued to that jury that Woodlock was the third perpetrator of the robbery, not my client. That wasn't your argument? That's not the argument you would have liked to have made? Yes, it is the argument we would have liked to have made. It would have been consistent with the argument at trial. The argument at trial where he didn't know about Woodlock was that Reese and Jackson did this crime. And that Jackson is now trying to blame... You just purported to argue, I think, that the defense theory wasn't to insert Woodlock for Lambert, but rather the defense theory would have been, well, there are a whole bunch of straw men that this incredulous witness Jackson is throwing up and Woodlock is one of many. But that doesn't sound like that can be true if there weren't other straw men. Then maybe I'm not expressing myself well. So let me start over and try again. So at trial, the defense theory was that Jackson and Reese did this case together and that Jackson, once he's caught, is now trying to blame Lambert in order to mitigate his own responsibility. So Lambert becomes the straw man to mitigate Jackson's responsibility. Jackson is thus able to take himself out of the bar and place himself in a car outside. If defense counsel knows about Woodlock, then defense counsel's argument is that much strengthened. Well, you're not arguing the straw man, the mystery third person who didn't exist. You're arguing, yeah, there were three people, but it wasn't my client. Woodlock instead of my client. I think you can argue both, but I think mostly you're arguing here Jackson is just naming people, again, still trying to mitigate his own role. He's still trying to take himself out of the bar and saying it was somebody else. He said it was this other dude. He said it was Monk. He said it was Woodlock. They went out and investigated Woodlock. That didn't turn up anything, so then he goes back to Monk. And Monk's a convenient fall guy and scapegoat for Jackson because he had just met him that night. They had hung out together. They had drank together. He had left them in Westville. He had said he didn't want to do this, at least according to a statement. He didn't want to be involved in this robbery. Reese and Jackson go off and do the robbery and then come back. So it's not that Woodlock was the third person. It's that Jackson is trying to mitigate his responsibility that he was in the bar. He was the guy at the steps. And that Reese was the shooter. And that was the defense theory. That's how the robbery went down. And that's what was argued at trial. That's what was argued at trial. And in post-conviction it was argued again. And I think the Pennsylvania Supreme Court specifically noted the defense argument was that the Woodlock statement was material because it would be consistent with the defense that Jackson was just looking for a scapegoat, a third person to blame in order to cover up his own criminal responsibility. Right. Let me ask you this. If you had had the opportunity to have a hearing on post-conviction in the state court, what evidence would you have proffered to show that the police activity report at issue was in fact material? I don't know that we would have called Jackson because I don't think Jackson is a particularly believable witness whatever he says at this point. Jackson's told so many stories that he comes in and says I said Woodlock was involved in the homicide. The commonwealth's not going to believe him. I don't know if the judge is going to believe him. I'm not going to rely my case on Jackson's credibility. What I'm going to do is I'm going to ask for discovery and I'm going to say because the question of whether Woodlock related to some other case, the paperwork that would answer that question, that's all in the hands of the commonwealth. I don't have access to that. I don't have access to the police officers. I don't have access to the police reports. I would have, if I were granted a hearing, I would have asked for discovery and I would have said I want to see discovery of what actions the police took to follow up. I want to see, first of all, I want to see if you have a statement, a fuller statement from Jackson when he names Woodlock. Did you ask the federal court for that? What officers we did, I don't think so, but quite honestly I don't remember if we did a discovery motion or not before. I guess what I'm sort of getting at is didn't Mr. Eisenberg have a point when he suggested that it's not really appropriate under AEDPA to posit to the court of appeals a variety of things that might cause something to be material if those variety of things weren't posited in the first instance to the PCRA court or at the very least the federal habeas court? Well, and I don't think, Judge Hardiman, that that's what I was doing. I don't think I was, I think what's that statement and how that could have been used in cross-examining Jackson and cross-examining And the state court, the state supreme court seems to say it's not because it's a one-off. It's isolated. There's just nothing, there's nothing anywhere in the files about Woodlock except this one document. That's what the state supreme court said, right? And so that's right. And to my mind, what that means, what I think that's ambiguous about what he was, it's that the police determined that Jackson was lying about Woodlock, that it was just another one of Jackson's lies. They went out to the bar. It was a potential lead that went nowhere. It was a potential lead that went nowhere. It was another story. So they go back to Jackson and says, you know, and say, you know, tell us again. Give us another story. Why doesn't that bolster the state court's determination, though? If it's a potential lead that went nowhere, then it, how could that have influenced the jury to come out with a different result? Because if Jackson lied about Woodlock, then it's logical that he lied about Lambert, too. Well, you established pretty thoroughly that he lied about a lot of things at trial. Right. But what wasn't established, apparently, is whether he was lying about Lambert, whether he was lying about there being a third person involved in the robbery. And so if you can show that Jackson lied about Woodlock, you can argue to the jury, just as I tried my best to explain to you, that he was lying about Lambert, too. That what he was doing was covering up his own criminal responsibility for being inside the barn for Reese being the shooter by adding a third person and putting the blame for the shooting on a third person. And his identifications were not consistent, which was the argument made by the prosecutor. He may not be a Girl Scout, but he was consistent as to that. Let me ask you a question. The order of remand, perhaps I haven't looked at it precisely, but I seem to read the If not ambiguous, it is material. If ambiguous, it is not. And the state Supreme Court found that held, as your friend says, the Supreme Court uses the word determined by the United States, that it was ambiguous and we never reached that. I read the Supreme Court of the United States opinion to say that we have to determine that if it's ambiguous, it will be material. It follows as the night If unambiguous, it is material. It follows as the night to death. It's not two separate determinations. I have to say I don't read the Supreme Court's opinion that way. I think the Supreme Court remanded it for you to address the question of ambiguity and its implication to the Brady that the Supreme Court didn't address the issue of whether the ambiguous and ambiguous statement could be material in any way at all. I think they sent it back to you, and I think particularly when they quote from the inculpatory or impeaching, they're sending the whole question back for you to address the issue of ambiguity. So I don't know who's right, but I read it a little more broadly. All right. Any final words? The last thing I would say is in terms of how could Jackson know about the 38 or the 32 or what guns was used? I think the answer to that is easy. He was there. He knew Reese had the 38. He knew what gun was being used in the shooting. He knew the 32. He knew about those guns because he and Reese had been using those guns in all those other robberies they've been doing. So that part of Mr. Eisenberg's argument I don't think adds anything to the analysis. Thank you very much for your time. Thank you. On behalf of my colleagues, I want to thank counsel for the exceptional argument and briefing. It's a pleasure to have such tremendous advocacy in this court. Thank you. We'll take the matter under advisement.